IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| GERALD FINKEN,<br><br>    Plaintiff,<br><br>v.<br><br>USA CYCLING, INC.; BREAKAWAY PROMOTIONS, LLC; OGDEN/WEBER CONVENTION VISITORS BUREAU, and DOES 1–10,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Civil No. 1:17-cv-79<br><br>Judge Clark Waddoups<br><br>Magistrate Judge Paul M. Warner |

# INTRODUCTION

Plaintiff Gerald Finken entered the 2014 USA Cycling Masters Road Championship race. On August 25, 2014, Finken did a pre-ride of the course using the map published for the race. As he came around a turn on the route, he saw a concrete barrier blocking the road. Finken attempted to swerve around it, but crashed and suffered serious neck and back injuries. He has filed suit against USA Cycling, Inc. and Breakaway Promotions, LLC for negligently failing to warn riders about the barricade. Defendants have moved for summary judgment on the ground that Finken signed a waiver of liability. For the reasons stated below, the court denies the motions for summary judgment.

**FACTUAL BACKGROUND**

The 2014 USA Cycling Masters Road Championship race ("2014 Championship") was held in Weber County, Utah on September 3–7, 2014. "USA Cycling is the national governing body for the sport of cycling in the United States of America and was responsible for conducting the 2014 Championships." Amended Complaint, ¶ 11 (ECF No. 20); USA Cycling Answer, ¶ 11 (ECF No. 30). It entered into an Independent Contractor Agreement with Breakaway Promotions, LLC ("Breakaway"), where Breakaway agreed to perform multiple duties, including implementing the "course design and layout for each race course as well as start and finish areas." Breakaway Agmt., ¶ 7 (ECF No. 56-7). Breakaway also agreed to be responsible for "[a]ll organization and course safety evaluations for each race venue." *Id.* Breakaway further agreed to supply information "for the race Technical Guide" and contracted that such information would be "precise and accurate[]." *Id.* USA Cycling retained the responsibility, however, to publish the Technical Guide "in a reproducible format that [could] be printed or sent digitally." *Id.* The Technical Guide included maps and course route information.[1] USA Cycling Depo., 33:19–35:1 (ECF No. 38-5) (given by Charles R. Hodge).

Before publication, USA Cycling typically reviewed maps to ensure compliance with its rules. Leif Depo., 9:24–10:10 (ECF No. 45-1). Once a map "was approved, [it] would post it online and make it part of the event materials." *Id.* 10:10–14. "One of the purposes of posting" the map online was so "participants or prospective participants [could] see . . . where the course [was to be] located." *Id.* at 10:15–20. Chad Sperry, the owner of Breakaway, asserts Breakaway

---

[1] It is unclear when the Technical Guide was released to the participants. The relevant map was posted earlier than the Technical Guide, as a separate document, and then included later in the Technical Guide.

prepared "a preliminary map" for USA Cycling to review, and then "USA Cycling created their own map for the technical guide and to post online of this particular race course." Sperry Depo., 30:4–17 (ECF No. 56-8). USA Cycling disputes it prepared the map. *Id.* at 30:18–23; Leif Depo., 11:1–5 (ECF No. 45-1).

Part of the route for the race went along State Road 226, which is known as the Old Snowbasin Road. Prior to "submit[ing] the course layout to USA Cycling for the event," Breakaway knew a portion of the road was closed near the Ard Nord Trailhead. Sperry Depo., 20:10–14, 23:1–3 (ECF No. 56-8). A concrete barricade had been placed across the road due to the road's condition beyond the barricade. *Id.* at 21:2–6, 22:16–20. The plan was to have the barricade removed after the road was repaired for the race. *Id.* at 26:21–23. No warnings about the road closure were noted when the course map was posted for participants to view.

Sperry did a site visit in early August 2014, and saw the concrete barriers were still in place at that time. *Id.* at 22:9–15, 23:8–11. Additionally, Rachel Leif, USA Cycling's National Events Manager, also learned prior to the race that a portion of the road was closed. Leif Depo., 12:22–24 (ECF No. 45-1). "[A] concerned masters rider" sent an email to USA Cycling, which contained photographs of the route, including a picture of the concrete "barriers across the road and a 'Road Closed' sign." *Id.* at 14:1–19, 15:3–5. The Vice President of National Events, Micah Rice, forwarded the email to Sperry on August 5, 2014, and copied Leif on it. *Id.* at 14:18–22, 39:24–40:2. "[B]y August 5th or 6th, 2014, [Leif] understood the road was closed." *Id.* at 15:10–13. Although she "was the point person," and knew she was viewing pictures of the racecourse, she did not take action to notify participants of the road closure at that time. *See id.* at 13:11–17, 15:6–9, 16:13–22. Her conversations with participants pertained only to potholes

that needed to be fixed in the road. *Id.* at 17:14–18.  This is so even though Leif knew that "race participants will often pre-ride a course to prepare." *Id.* at 30:3–10.  Similarly, Sperry took no action to notify participants about the closure.  Sperry Depo., at 40:10–25 (ECF No. 56-8).

On August 25, 2014, Finken did a pre-ride of the course using the map provided by USA Cycling.  Finken Depo., 60:5–7, 63:6–16 (ECF No. 38-3).  Finken alleges he rode the route cautiously during his pre-ride due to his lack of knowledge about the course and wet road conditions. *Id.* at 68:8–25.  Nevertheless, as he came around a turn and saw the concrete barriers across the road, he "locked up the brakes" but was not able to stop. *Id.* at 78:18–79:12.  He attempted to swerve onto a worn path beside the barrier, but his handlebars and left hand struck the barrier. *Id.* at 77:10–16, 80:7–12, 82:24–83:21.  Finken became airborne and landed on his right side. *Id.* at 82:4–5, 83:25–84:2.  He was hospitalized for two days for serious neck and back injuries. *Id.* at 107:16–108:25.

After the accident, USA Cycling modified the Technical Guide to warn participants doing a pre-ride that a portion of the route was closed and would remain closed until the day before the event.  Leif Depo., 24:23–25:3, 26:3–7, 27:9–21.  Finken contends Breakaway and USA Cycling were negligent in not giving that warning sooner.  Both defendants contend, however, they cannot be liable for negligence because Finken signed a pre-injury waiver entitled, "Acknowledgment of Risk, Release of Liability, Indemnification Agreement and Covenant not to Sue" (the "Waiver").

Finken registered for the race on or about July 27, 2014.  Order Summary, at 4 (ECF No. 45-1).  Part of that registration required Finken to sign the Waiver.  Finken does not recall seeing or signing the Waiver, but for purposes of these summary judgment motions, it is undisputed that

4

he signed it. The Waiver is broad. It notes "that cycling is an inherently dangerous sport" and includes dangers such as "collision with pedestrians, vehicles, other riders, and fixed or moving objects." Waiver, 2 (ECF No. 56-6) (emphasis omitted). It further notes "the possibility of serious physical and/or mental trauma or injury, or death associated with the event." *Id.* Finken agreed to "waive, release, discharge, hold harmless, and promise to indemnify and not to sue" USA Cycling and specified others for "any and all rights and claims including claims arising from [their] own negligence." *Id.* (emphasis omitted). Finken also agreed to release "all damages which may be sustained by [him] directly or indirectly in connection[] with, or arising out of, [his] participation in or association with the event, or travel to or return from the event." *Id.*

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if the movant demonstrates that there is 'no genuine issue as to any material fact' and that it is 'entitled to judgment as a matter of law.'" *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (quoting Fed. R. Civ. P. 56(c)). The defendants' motions seek summary judgment based on the terms of a preinjury waiver. The parties have applied Utah law to address the claims in this case.

### II. WAIVER AND INDEMNITY AGREEMENTS

In Utah, "[i]t is well settled that preinjury releases of claims for ordinary negligence can be valid and enforceable." *Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, ¶ 25, 301 P.3d 984 (citation omitted). "Indeed . . . the majority of jurisdictions" permit "people to surrender their rights to recover in tort for the negligence of others." *Id.* (citations omitted). This does not

mean, however, that preinjury waivers are favored. Rather, "the shortcomings of exculpatory clauses . . . provide ample cause to approach preinjury releases with caution." *Berry v. Greater Park City Co.*, 2007 UT 87, ¶ 11, 171 P.3d 442, *overruled in part by Penunuri*, 2017 UT 54, ¶¶ 22, 27. Thus, not all preinjury waivers are valid. "Specifically, (1) releases that offend public policy are unenforceable; (2) releases for activities that fit within the public interest exception are unenforceable; and (3) releases that are unclear or ambiguous are unenforceable." *Penunuri*, 2013 UT 22, ¶ 25 (quotations and citations omitted).

As to indemnification provisions, "[i]n general, the common law disfavors agreements that indemnify parties against their own negligence because one might be careless of another's life and limb, if there is no penalty for carelessness." *Hawkins v. Peart*, 2001 UT 94, ¶ 14, 37 P.3d 1062 (quotations and citation omitted). "Because of this public safety concern," Utah court's "strictly construe indemnity agreements against negligence." *Id.* (citation omitted).

### A. Clarity of the Waiver

"Preinjury releases, to be enforceable, must be communicated in a clear and unequivocal manner." *Pearce v. Utah Athletic Found.*, 2008 UT 13, ¶ 22, 179 P.3d 760, 767, *overruled in part by Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, ¶¶ 22, 27, (quotations and citations omitted). The Utah Supreme Court has stated, "[t]o be effective, a release need not achieve perfection . . . . It suffices that a release be clear, unambiguous, and explicit, and that it express an agreement not to hold the released party liable for negligence." *Id.* (quotations and citation omitted). Whether a contract is facially ambiguous is a question of law. *Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269 (citation omitted). If there is ambiguity as to the intent of the parties, that is a question of fact requiring admission of parol evidence. *Id.* (citation omitted). In

this case, however, the court only addresses facial ambiguity because if the Waiver is not clear on its face, it is unenforceable.

      i.     USA Cycling

The Waiver has clear language releasing USA Cycling from negligence. What is less clear is negligence from what activity? The Waiver notes "that cycling is an *inherently dangerous* sport" due to such dangers as "collision with pedestrians, vehicles, other riders, and fixed or moving objects." Waiver, at 2 (ECF No. 56-6) (emphasis added). It further notes "the possibility of serious physical and/or mental trauma or injury, or death *associated with the event*." *Id.* (emphasis added). These provisions appear to provide notice about the event itself and the dangers that may arise from it. Finken's injuries, however, arose from a pre-ride. When a map is published of a racecourse on a public road, one reasonably anticipates that road is open to travel. Although both defendants knew the road was closed until the race, they did not inform participants of that fact. Thus, they exposed pre-riders to a risk that is *not* inherent in a race on a public road. *See Rutherford v. Talisker Canyons Fin., Co., LLC*, 2019 UT 27, ¶¶ 19, 79, 445 P.3d 474 (citation omitted) (noting inherent risks are those that are an essential characteristic of a sport and "cannot be alleviated by the use of reasonable care" by an operator).

The Waiver goes on to state, however, that it releases "all damages which may be sustained by [Finken] directly or indirectly *in connection*[] *with*, or arising out of, [his] participation in or association with the event, or travel to or return from the event." *Id.* (emphasis added). The only reason Finken was on the Old Snowbasin Road was in preparation for the event. His pre-ride therefore was in connection with his participation in that 2014 Championship race. Accordingly, the court concludes the Waiver was clear as to USA Cycling.

*ii.     Breakaway*

Breakaway contends the waiver also applied to it because it releases "USA Cycling's Event Directors, Affiliates, Agents, and Officials." Mem. in Supp., at 14 (ECF No. 56). While the Waiver does release those persons, Breakaway has not specified which of those it was. It has failed to show it was an event director, affiliate, agent, or official.

The Waiver was USA Cycling's waiver, and it appears to protect those persons directly affiliated with USA Cycling. Based on Leif's title as National Event Manager and Rice's title as Vice President of National Events, the "Event Directors" may reference them and not Breakaway. The term is not defined in the Waiver and is too ambiguous for the court to conclude the Waiver is sufficiently clear on its fact to apply to Breakaway.

Breakaway entered an Independent Contractor Agreement that specifies it was "not an employee, or servant of" USA Cycling. Breakaway Agmt., ¶ 2 (ECF No. 56-7). The agreement further specifies that Breakaway would "be solely and entirely responsible for its acts, and for the acts of independent contractor's agents, employees, servants and subcontractors during the performance of this agreement." *Id.* ¶ 3 (emphasis omitted). Nowhere in the agreement does it identify Breakaway as an event director, or as an affiliate, agent, or official of USA Cycling.

Because the Waiver does not clearly and unambiguously extend to Breakaway as an independent contractor, the court concludes Finken's claim against Breakaway is not barred.

**B.     Public Interest Exception**

The public interest exception invalidates a preinjury release when "it attempts to limit liability for activities in which there is a strong public interest." *Berry*, 2007 UT 87, ¶ 12. The Utah Supreme Court has adopted the six factors stated in *Tunkl v. Regents of the University of*

*California*, 383 P.2d 441, 445–46 (Cal. 1963) to determine if the public interest exception applies. *Pearce*, 2008 UT 13, ¶ 17 (citations omitted). For recreational activities, however, it has gone one step further. In *Pearce*, the Court "join[ed] other states in declaring, as a general rule, that recreational activities do not constitute a public interest and that, therefore, preinjury releases for recreational activities cannot be invalidated under the public interest exception." *Id.* at ¶¶ 18, 21.

As stated above, Finken's pre-ride was done in connection with his expected participation in the 2014 Championship. Because the event and the pre-ride were recreational activities, the court concludes the public interest exception is inapplicable in this case.

### C. Public Policy Exception

Finken further contends the Waiver is unenforceable because it is contrary to public policy. "To determine whether a contract offends public policy," a court must "first determine whether an established public policy has been expressed in either constitutional or statutory provisions or the common law." *Penunuri*, 2013 UT 22, ¶ 26. The Utah Supreme Court also has stated, "for a contract to be void on the basis of public policy, there must be a showing free from doubt that the contract is against public policy." *Id.* (quotations, citation, and alteration omitted). Thus, this exception should be applied, "if at all, only with the utmost circumspection." *Id.* (quotations and citation omitted).

#### i. *Penunuri Analysis - Equine Act*

In *Penunuri*, the Utah Supreme Court addressed whether Utah's Equine and Livestock Activities Act made certain preinjury waivers unenforceable as a matter of public policy. The waiver at issue in *Penunuri*, noted "that horseback riding involves significant risk of serious

9

personal injury, and that there are certain inherent risks associated with the activity . . . that may result in injury, harm, or death to persons on or around them." *Id.* at ¶ 3 (quotations omitted).

Utah's Equine Act specifies "equine activity sponsors are not liable for injuries caused by the 'inherent risks' associated with equine activities." *Id.* at ¶ 9 (citing Utah Code Ann. § 78B-4-202)). The same section also specifies, however, that a sponsor may be liable if an injury results from actions of the sponsor. Utah Code Ann. § 78B-4-202(2). The plaintiff argued the Legislature struck a balance as a matter of public policy by removing liability for inherent risks but keeping liability for negligent actions. She asserted the balancing of interests was similar to the Court's analysis in *Rothstein v. Snowbird Corp.*, 2007 UT 96, 175 P.3d 560. Thus, she argued any waiver barring recovery from a sponsor who was negligent was contrary to public policy. The Court disagreed.

It found the Equine Act did not have a public policy statement like Utah's Inherent Risk of Skiing Act addressed in *Rothstein*. *Id.* at ¶ 24. When the Legislature eliminated liability for the inherent risks of horseback riding, it did "not explain the motivation behind" that decision. *Id.* at ¶ 32. Nor did the Equine Act note the economic importance of the activity for the State. Most importantly, it lacked the central purpose of the Skiing Act to "permit equine sponsors to purchase insurance at affordable rates." *Id.* at ¶ 33 (quotations and citation omitted). "[I]t was that 'central purpose' . . . that led [the Court] to infer that the Legislature had struck a 'public policy bargain' when it eliminated liability for the inherent risks of skiing." *Id.* Without "a similar expression . . . in the Equine Act," the Court "resist[ed] the temptation to add language or meaning to the Act where no hint of it exist[ed] in the text." *Id.* (quotations and citation omitted). Thus, the Court concluded the waiver in *Penunuri* did not violate public policy. The

10

Court reached a similar conclusion in *Pearce*, whereby "a preinjury release between a public bobsled ride operator and an adult bobsled rider" was deemed enforceable. *Pearce*, 2008 UT 13, ¶ 15.

        ii.       *Rothstein Analysis - Skiing Act*

The distinguishing factor between *Rothstein* and other cases is the combination of a public policy statement and a legislative balancing of risks between operators and participants. In *Rothstein*, a skier "collided with a retaining wall constructed of stacked railroad ties and embedded partially in the mountain." *Rothstein*, 2007 UT 96, ¶ 3. "At the time of the accident, a light layer of snow camouflaged the retaining wall from [the skier's] view. . . . [T]he retaining wall was unmarked and no measures had been taken to alert skiers to its presence." *Id.* Rather, the ski resort "had placed a rope line with orange flagging near the wall," but the rope stopped short and created "a large gap between the end of the rope and a tree." *Id.* The skier thought the gap "indicated an entrance to the Fluffy Bunny run." *Id.* He suffered serious injuries when he collided with the retaining wall. *Id.*

When analyzing Utah's Skiing Act, the Court observed that "[s]eldom does a statute address directly the public policy relevant to the precise legal issue confronting a court." *Id.* ¶ 11. It nevertheless found a clear "public policy rationale" for the Skiing Act. *Id.* Within that statute, the Legislature found that skiing "'significantly contribute[es] to the economy of this state.'" *Id.* ¶ 12 (quoting Utah Code Ann. § 78-27-51 *renumbered at* § 78B-4-401). The Legislature also found ski operators were having difficulty obtaining insurance at an affordable rate or at all. *Id.* (citing Utah Code Ann. § 78-27-51). Thus, it struck a balance where operators could not be held liable "'for injuries resulting from those inherent risks.'" *Id.* (quoting Utah

Code Ann. § 78-27-51).

The Court therefore found the following:

> The bargain struck by the Act is both simple and obvious from its public policy provision: ski area operators would be freed from liability for inherent risks of skiing so that they could continue to shoulder responsibility for noninherent risks by purchasing insurance. By extracting a preinjury release from [the skier] for liability due to their negligent acts, [the resort] breached this public policy bargain.

*Id.* ¶ 16. The distinguishing factor between the balance struck in the Equine Act and the balance struck in Skiing Act was the express public policy statement that the balance was necessary due to the economic benefit to the State and the ski resort's inability to insure itself for the inherent risks associated with skiing.

### iii. Bike Racing Analysis

The facts giving rise to Finken's injuries are closely analogous to the facts in *Rothstein*. In *Rothstein*, a wall was unmarked and where one did not expect it to be. In this case, a barricade was unmarked on the course map and where one did not expect it to be. Neither the wall nor the barricade was within the inherent risks of the relevant sport. Although the facts are similar between the two cases, the issue before the court is whether Utah has a public policy that precludes USA Cycling from avoiding liability for risks that are not inherent in a bike race.

The Utah Legislature has found there are inherent risks associated with bike *riding*. Utah Code Ann. § 78B-4-509(1)(a), (d). For injuries arising from *inherent risks* of participating in bike riding, the Legislature has afforded protection to "a county, municipality, local district, . . . or special service district." *Id.* § 78B-4-509(2)(a). It also has afforded protection to "the owner of property that is leased, rented, or otherwise made available to" the government "for the

purpose of providing or operating a recreational activity." *Id.* § 78B-4-509(2)(b). The Legislature chose not to "relieve any other person from an obligation that the person would have in the absence of this section to exercise due care." *Id.* § 78B-4-509(3)(b). That balance is different from the Equine Act and the Skiing Act because it leaves operators of biking events without any statutory protections.

In another section of statute, the Legislature more particularly addressed bike *races*. It stated bike racing is permitted on a highway *only if* approved by the highway authority of the relevant jurisdiction. *Id.* § 41-6a-1111. The State has a significant interest in ensuring safety on its public highways. Bike racing can impact not just the participants, but spectators or those in a motor vehicle trying to navigate the same highway. Thus, the Legislature specified before approval may be granted, conditions must exist to "assure reasonable safety for all race participants, spectators, and other highway users." *Id.* § 41-6a-1111(2)(b).

The Utah Department of Transportation instituted regulations to carry out the intent and purpose of the statute. The Department noted one purpose of its regulation was to "[e]ncourage and support special events such as . . . bicycle races" because it "recognize[d] their importance to Utah's economy and to the well-being of residents of and visitors to Utah." Utah Admin. Code R920-4-1(1)(b). Nevertheless, "to further . . . governmental interests," it implemented safety protocols to ensure "[t]he safety of all participants in, and spectators of, special events," as well as the travelling public. *Id.* at R920-4-1(2)(b), (c).

One protocol requires a person or entity to obtain a special event permit before holding a bike race on a highway. *Id.* at R920-4-1(4)(g), (i). To obtain a special event permit, the applicant must "provide a detailed map." *Id.* at R920-4-13. The applicant also must have

"liability insurance," and such insurance must list the State of Utah "as an additional insured." *Id.* at R920-4-9(1); *see also id.* at R920-4-6. Consistent with statute, the applicant must obtain a waiver and release of liability from participants that releases the State and governmental personnel. *Id.* at R920-4-9(3)–(4). Although the statutory provision bars claims against the government for inherent risks, the regulatory waiver bars all claims. Similarly, though, there is no exclusion from liability for the operator of a bike race.

Based on the *Rothstein* analysis and harmonization of the relevant statutes and regulations, the court concludes the Legislature and Department of Transportation allow bike races on public highways but recognize inherent risks associated with such races. Safety is paramount because a bike race can impact not only those in the race, but spectators, or motorists who have no association with it. Detailed maps and liability insurance are pre-requisites to obtaining a special event permit to help protect against risks. As the Utah Supreme Court noted in *Hawkins*, "one might be careless of another's life and limb, if there is no penalty for carelessness." *Hawkins*, 2001 UT 94, ¶ 14 (quotations and citation omitted). Thus, the requirement for liability insurance helps ensure safety for participants, spectators, and the travelling public.

Utah has recognized, however, that if liability insurance must cover inherent and non-inherent risks of a sport, the cost may be prohibitive and thereby hinder holding events or activities that would provide an economic benefit to the state. Hindering such economic benefits would be contrary to one of the stated purposes of the regulation. Thus, one may reasonably conclude that liability for inherent risks may be waived by the bike race participants so as not to hinder the economic benefits to the State.

The court concludes, however, if an operator is allowed to obtain a waiver from participants even for risks that are not inherent in the sport, it would alter one of the elements for a special event permit. Liability insurance is meant to cover liabilities. If all liability has been waived for bike participants, then the purpose for carrying liability insurance is altered as to those participants. Because bike races on highways are prohibited *unless* the reasonable safety of *participants*, spectators, and the travelling public may be assured, a balance was struck and cannot be altered via a waiver of liability. Accordingly, the court concludes as a matter of public policy, the Waiver in this case is unenforceable because it attempts to waive liability even for non-inherent risks arising from or associated with the negligent acts of USA Cycling.[2]

    iv. *Modification of the Utah's Skiing Act*

An additional issue has arisen since briefing on the motions. From 2007 until 2020, the *Rothstein* balance existed between operators and skiers whereby preinjury waivers were enforceable for risks inherent in skiing, but not for unforeseen risks arising from the negligent actions of the operator. *See Rothstein*, 2007 UT 96, ¶¶ 16, 19. In 2020, the Utah Legislature altered this balance by passing legislation that allows preinjury waivers without regard to whether the risk was unforeseen. Utah Code Ann. § 78B-4-405 (2020). Moreover, claims brought on or after May 12, 2020, if not otherwise barred, have a noneconomic damages cap of $1,000,000. *Id.* at § 78B-4-406. The Legislature's actions have abrogated the ruling in *Rothstein* and will necessarily impact future preinjury waiver analyses for other recreational activities.

The question here is whether the Legislature's change of public policy should be applied retroactively to the analysis in this case. The United States Supreme Court has stated "the

---

[2] This same holding would apply to Breakaway if the Waiver were applicable to it.

15

principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 265, 114 S. Ct. 1483, 1497, 128 L. Ed. 2d 229 (1994) (quotations and citation omitted).  Moreover, the Due Process Clause "protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Id.* at 266 (citation omitted).

Here, the legislation was approved on March 28, 2020, but made effective May 12, 2020. This shows a clear intent for future application of law.  Accordingly, the public policy analysis applied in *Rothstein* was still applicable at the time of the events in this case and informs this court's decision.

## CONCLUSION

For the reasons stated above, the court DENIES the Motions for Summary Judgment filed by USA Cycling and Breakaway (ECF Nos. 38, 56).

DATED this 3rd day of June, 2020.

BY THE COURT:

_____
Clark Waddoups
United States District Judge